UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Robert K. Murphey, Jr.,

Plaintiff,

v.

Civil No. 01-10 (JEL/JGL)
ORDER

City of Minneapolis,

Defendant.

---

James G. Ryan, Esq., appeared for Plaintiff Robert K. Murphey, Jr.

Assistant Minneapolis City Attorney Caroline M. Bachun, Esq., appeared for Defendant City of Minneapolis.

---

This is an employment discrimination action brought by Robert K. Murphey, Jr. against his former employer, the City of Minneapolis (Minneapolis), under the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101-12213 (1994) (ADA). Minneapolis removed the action from state district court pursuant to 42 U.S.C. §§ 1441(a)-(b), 1446 (2000). The matter is before the Court on Minneapolis's Motion for Summary Judgment.[1]

Murphey suffered his fifth on-the-job back injury in May 1997. Murphey claims that, as a result of this injury, he is a "qualified individual with a disability" within the meaning of the ADA—that is, that he is "an individual with a disability who, with or without reasonable accommodation, could perform the essential functions" of his job. *See id.* § 12111(8). He claims further that Minneapolis violated the ADA by failing to make reasonable

---

[1] The Court heard Minneapolis's motion on August 5, 2002. On August 13, 2002, Minneapolis filed a letter discussing three recent decisions of the United States Court of Appeals for the Eighth Circuit that Murphey had cited at the hearing for the first time; Murphey filed a letter in response discussing the same cases on August 16, 2002.

SEP 2 7 2002
RICHARD D. SLETTEN, CLERK
JUDGMENT ENTERED SEP 2 7 2002
DEPUTY CLERK'S INITIALS

accommodations and by terminating his employment because of his disability in November 1999. Approximately one year before he was terminated, Murphey submitted an application for total and permanent disability benefits to the Public Employees Retirement Association (PERA) in which he represented that he was "total[ly] and permanent[ly] disab[led]," and that he was unable "to engage in any substantial gainful activity." Murphey's application was approved, and he received benefits from October 1998 through August 2001.

In support of its Motion for Summary Judgment, Minneapolis argues, *inter alia*, that Murphey has failed to proffer a sufficient explanation for the apparent inconsistency between his present ADA claim, which is predicated on his ability to perform the essential functions of his job, with or without reasonable accommodation, and his successful application for total and permanent disability benefits, which was predicated on his inability to work. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806-07 (1999). The Court agrees that Murphey has not satisfied his burden of coming forward with a sufficient explanation for this inconsistency, and it therefore grants Minneapolis's motion.

**SUBJECT MATTER JURISDICTION**

This Court has jurisdiction over Murphey's ADA action pursuant to 28 U.S.C. § 1331 (2000), and 42 U.S.C. §§ 12117(a), 2000e-5(f)(3) (1994).

**BACKGROUND**

*Murphey's history as a Minneapolis employee*

Murphey began working for Minneapolis in 1971 as a laborer in its sanitation department. (Murphey Dep. at 9-10.) He moved from the sanitation department to the paving department in 1972. (*Id.* at 11-12.) Murphey suffered the first of five on-the-job injuries in November 1977, when he hurt his lower back by lifting a cast-iron casting that weighed 200

pounds. (*Id.* at 22.) His doctor told him that his back injury "was severe enough that [he] probably should not work in heavy construction." (*Id.* at 23.) Murphey did not work for Minneapolis again until the summer of 1983, when he was hired to perform the duties of an engineering aide I. (*Id.* at 17, 19-20.) The following summer, Murphey was transferred back to his former position as a laborer in the paving department. (*Id.* at 21.)

Murphey injured his back for the second time in 1987, again by lifting a 200-pound, cast-iron casting. (*Id.* at 23.) His third back injury occurred in 1995, when he lifted a 100- to 150-pound compressor off of the back of a utility truck. (*Id.* at 24-25.) Murphey suffered his fourth back injury in 1996. (*Id.* at 25.) Like his first and second injuries, Murphey's fourth injury occurred when he lifted a 200-pound casting. (*Id.*) After each of these injuries, Murphey, following the advice of his doctor, took three to four weeks off and then returned to work. (*Id.* at 23-26.)

In 1997, Murphey elected to move from the paving department to the ramps department, where his sole duty was to clean ramp decks using a high-pressure washer. (*Id.* at 26-28.) Murphey expected that the ramps department would be a more "back-friendly" environment. (*Id.* at 27.) In May 1997, approximately one month after he began working in his new position, Murphey injured his back for the fifth time as he was dragging hoses and a high-pressure washer up an incline. (*Id.* at 26-28.) Murphey again followed his doctor's advice and took three to four weeks off. (*Id.* at 28.)

When Murphey returned to work, he had a lifting restriction of 20 pounds and also had medical restrictions related to bending, prolonged sitting, and prolonged standing. (*Id.* at 29-30.) Murphey was given a position as a painter's assistant that required him to perform light duties such as taping, preparing paint, cleaning brushes, and driving. (*Id.* at 29.) This position was part

time: If there was light-duty work available, Murphey would work; if not, he would stay home and draw from his accrued vacation and medical-leave time. (*Id.* at 29-31.) This arrangement came to an end in October 1997, when Murphey ran out of vacation and medical-leave time. (*Id.* at 31.) Murphey did not perform any work for Minneapolis from October 1997 to the spring of 1998. (*Id.* at 47.)

In the spring of 1998, Murphey obtained a part-time position in Minneapolis's cash-management department. (*Id.* at 56.) This position "entailed sitting at a desk, going through thousands of water bills and placing them in their assigned pile." (*Id.* at 56-57.) Shortly after he started working, Murphey's chair caused him to feel discomfort in his back. (*Id.* at 58.) He made two complaints about the chair and asked his supervisor for "some accommodations." (*Id.* at 58-59.) In response, Minneapolis provided him with a cardboard box to place on top of his desk, which allowed Murphey to alternate between sitting and standing as he sorted bills. (*Id.*) He did not receive a new chair. (*Id.* at 60.) Murphey stopped sorting bills after approximately one month "[b]ecause of the discomfort and [Minneapolis's] seemingly not being willing to provide [him] with a back-friendly environment." (*Id.* at 63.)

In August or September 1998, Murphey returned to work for Minneapolis as a janitor in its lands and buildings department. (*Id.* at 67.) His job duties included picking up cigarette butts, changing towels in restrooms, emptying wastepaper baskets, and tending to plants. (*Id.* at 69, 72-73.) Murphey understood that the job would eventually require him to perform additional duties, such as vacuuming, sweeping, mopping, and shoveling snow. (*Id.* at 73, 79.) In mid-October 1998, Murphey met with Mary Page, an employee in Minneapolis's human resources department, to discuss Minneapolis's plan to place him into its job bank program. (*Id.* at 80-81.) Under this program, Minneapolis employees whose "permanent medical restrictions" prevented

them "from returning to their pre-injury job, with or without reasonable accommodation," were given "temporary or alternate duties" and placed into a job bank for 120 days. (Bachun Aff. ¶ 5, Ex. 4.) Minneapolis determined which employees were eligible for the job bank. (*Id.*) "Subject to civil service rules and bargaining unit agreements," the program required Minneapolis to attempt to fill its vacant positions with job-bank employees before offering the positions to anyone else. (*Id.*) If a job-bank employee was not placed in a position within 120 days of entering the job bank, "the employee [was] separated from City service." (*Id.*) At his October 1998 meeting with Page, Murphey refused to sign a document that would have authorized his placement into the job bank. (Murphey Dep. at 83.) He also quit his job as a janitor, in part because the position involved a lot of bending and "was too back intensive," and in part because he did not want to enter the job bank. (*Id.* at 67-68, 83-84.)

Murphey eventually agreed to be placed into the job bank, and he went back to work for Minneapolis on July 12, 1999, as an engineering aide I. (*Id.* at 94, 103.) According to Murphey, he was able to perform the duties of an engineering aide I within his medical restrictions. (*Id.* at 97.) He worked full-time for less than a week and then switched to a four-hour day "because he started having some medical difficulties that made working eight hours difficult." (*Id.* at 103-04.) Specifically, the long drive to work was causing his back to hurt, and he was having trouble dealing with the death of his daughter. (*Id.* at 104.)

On October 15, 1999, Murphey and his attorney met with Page, Assistant Minneapolis City Attorney Ed Backstrom, and Nancy Ross, Minneapolis's workers' compensation claims coordinator. (*Id.* at 113-14.) The purpose of the meeting was to discuss Murphey's employment status. (*Id.* at 114.) Murphey was told that his supervisors "love[d]" him and were "very satisfied" with his work, that he was doing an "excellent" and "perfectly wonderful" job, and that

he would continue to work as an engineering aide I. (*Id.* at 114-15, 117.) He was also told that it would be beneficial if he took some skill-enhancement classes. (*Id.* at 115-18.) Page stated that she would arrange the classes for him and provide him with notification as to when and where they would be held. (*Id.* at 115-16.) Murphey left the meeting thinking that he had a permanent job as an engineering aide I, and that the job bank's 120-day clock had therefore stopped ticking. (*Id.* at 117, 180-81.)

On November 2, 1999, Page told Murphey that she was lining up skill-enhancement classes for him. (*Id.* at 116, 180.) The next day, Murphey received a termination letter. (*Id.* at 180.) The letter stated, in relevant part:

> This letter is to advise you that your Job Bank 120-day period was completed on November 2, 1999, and we must prepare you for the next step in the process.
>
> Since a placement did not occur prior to November 2, 1999, this is notification that you are being released from City service on the basis that your injury and resulting restrictions have not allowed return to your pre-injury position and no appropriate position has become available into which you can be placed.

(Murphey Dep., Ex. 59.) Murphey called Page after he read the letter; she told him that it was a mistake. (Murphey Dep. at 181.) Murphey's supervisor said the same thing, telling him that he should continue to work. (*Id.* at 184.) Murphey continued to work as an engineering aide I on a permit, or temporary, basis until November 30, 1999. (*Id.* at 109, 184.) He did not return to work for Minneapolis after that date.

*Murphey's applications for, and receipt of, disability benefits*

In November 1998, approximately one month after Murphey quit his job as a janitor in Minneapolis's lands and buildings department, Murphey submitted a notarized application for total and permanent disability benefits to the PERA. (*Id.* at 231; Murphey Dep., Ex. 64.) The

PERA's members can qualify for a range of retirement, disability, and survivor benefits through programs established by Minnesota law. *See* Minn. Stat. ch. 353 (2000). In his application, Murphey described his disability as "Severe Spinal Stenosis. A deteri[or]ation of lower spinal area caused by repeated injuries, i.e. 1977, 1987, 1995, 1996, 1997." (Murphey Dep., Ex. 64.) Murphey's application also included a Medical Disability Report (MDR) in which Murphey's physician verified that Murphey "me[t] the standards for total and permanent disability." (Murphey Dep., Ex. 66.) Quoting Minn. Stat. § 353.01, subd. 19 (2000), the MDR stated that "total and permanent disability" meant:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to be of long-continued and indefinite duration. Long-continued and indefinite duration means that the disability has been or is expected to be for a period of at least one year.

(Murphey Dep., Ex. 66.) The PERA approved Murphey's application in May 1999 retroactive to October 14, 1998. (Murphey Dep. at 232; Murphey Dep., Ex. 65.) The PERA's first payment to Murphey covered October 14, 1998, to May 31, 1999. (Murphey Dep. at 232; Murphey Dep., Ex. 65.) He continued to receive disability-benefits payments from the PERA on the first day of each month through August 2001. (Murphey Dep. at 230, 232-33.)

Murphey purchased a mortgage-insurance policy from U.S. Life Credit Life Insurance Company (U.S. Life) in 1996. (*Id.* at 222.) The policy stated, in part: "If you become totally disabled . . . [U.S. Life] will pay you a benefit." (Murphey Dep., Ex. 60.) "Total disability means that due to sickness or accidental injury you are unable to perform the duties of any occupation for which you are reasonably qualified by education, training or experience." (*Id.*) Murphey submitted claims for total disability benefits to U.S. Life in February, March, April, and May 1999. (Murphey Dep. at 226-27; Murphey Dep., Ex. 62.) He did not submit any

claims from June 1999 to October 1999, a period of time that included the months during which he worked as an engineering aide I. (Murphey Dep. at 225-27.) Murphey submitted additional claims for total disability benefits in November and December 1999, and in various months in 2000. (*Id.* at 227-28; Murphey Dep., Ex. 62.) All of Murphey's claims were approved by U.S. Life, which made payments to Murphey's bank on his behalf.[2] (Murphey Dep. at 223-25; Murphey Dep., Ex. 63.)

*Murphey's ADA claim*

In March 2000, Murphey filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging that Minneapolis had violated the ADA by discriminating against him on the basis of his disability. (Compl. ¶ 16.) The EEOC issued a right-to-sue letter in September 2000, notifying Murphey that he could pursue his claim by commencing a legal action within 90 days of his receipt of the letter. (*Id.* ¶ 17.) Murphey filed an ADA action against Minneapolis in Minnesota District Court in December 2000. (Compl. at 1, 10.) The Complaint alleges that, "[f]rom at least July of 1999 onward, up to and including the date of his discharge, [Murphey] was a 'qualified individual with a disability' within the meaning of the ADA." (Compl. ¶ 23.) It alleges further that Minneapolis failed to make reasonable accommodations and discharged Murphey from employment because of his disability in violation of the ADA's prohibition against employment discrimination. (Compl. ¶¶ 23-26.) Minneapolis removed the action to this Court pursuant to 28 U.S.C. §§ 1441(a)-(b), 1446, and now moves for summary judgment.

---

2 Although the record is unclear, it is possible that Murphey also submitted claims for, and received, total disability benefits in 1998 and 2001. (Murphey Dep. at 227-28.)

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Id.* at 323. If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmoving party. *Harlow v. Fitzgerald*, 457 U.S. 800, 816 n.26 (1982); *Ross v. Kansas City Power & Light Co.*, 293 F.3d 1041, 1048 (8th Cir. 2002).

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual." 42 U.S.C. § 12112(a). The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8). To establish a claim under the

ADA, a plaintiff must show that: (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job, with or without reasonable accommodation; and (3) he has suffered adverse employment action because of his disability. *Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 948 (8th Cir. 1999); *Benson v. N.W. Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir. 1995).

Relying primarily on the Supreme Court's decision in *Cleveland*, Minneapolis argues that it is entitled to summary judgment because Murphey has not sufficiently explained the inconsistency between his present claim that he can perform the essential functions of his job, with or without reasonable accommodation, and his successful applications for disability benefits, in which he represented that he had a "total and permanent disability" and was "totally disabled."

*Cleveland* involved an ADA action brought by a plaintiff who had sought and obtained Social Security Disability Insurance (SSDI) benefits. *Cleveland*, 526 U.S. at 798. In connection with her application for those benefits, the plaintiff made sworn statements that she was "disabled" and "unable to work." *Id.* In contrast, as an ADA claimant, the plaintiff bore the burden of proving that she was a person "who, with or without reasonable accommodation, can perform the essential functions" of her job. *Cleveland*, 526 U.S. at 806 (*citing* 42 U.S.C. § 12111(8)).

The Supreme Court noted that, although there is an apparent conflict between an SSDI claim and an ADA claim, the conflict is not inherent because "there are too many situations in which [they] can comfortably exist side by side." *Cleveland*, 526 U.S. at 802-05 (providing examples of situations in which the two claims do not conflict). Consequently, "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA

claim. Nor does the law erect a strong presumption against the recipient's success under the ADA." *Cleveland*, 526 U.S. at 797-98. However, "an ADA plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim" because "a plaintiff's sworn assertion in an application for disability benefits that she is, for example, 'unable to work' will appear to negate an essential element of her ADA case." *Cleveland*, 526 U.S. at 806. Thus:

> When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the necessary elements of an ADA claim. To defeat summary judgment, that explanation must be sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statements, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation."

*Cleveland*, 526 U.S. at 807; *see also Lane v. BFI Waste Sys. of N. Am.*, 257 F.3d 766, 769-71 (8th Cir. 2001) (applying *Cleveland* and affirming summary judgment for defendant employer); *Lloyd v. Hardin County, Iowa*, 207 F.3d 1080, 1084-85 (8th Cir. 2000) (same); *Moore v. Payless Shoe Source, Inc.*, 187 F.3d 845, 847-48 (8th Cir. 1999) (same).

Unlike the plaintiff in *Cleveland* and the plaintiffs in nearly all of the subsequent cases decided under *Cleveland*, Murphey neither applied for nor received SSDI benefits. He did, however, represent that he was "total[ly] and permanent[ly] disab[led]" and "totally disabled" in his applications for benefits from the PERA and U.S. Life. On these facts, the Court must consider the threshold issue of whether *Cleveland*'s holding extends to cases involving claims for disability benefits through programs that are governed by state statutes or a private insurance contract, rather than the Social Security Act.

For the reasons that follow, the Court is convinced that *Cleveland* applies to Murphey's representations to the PERA. First, the Supreme Court did not explicitly limit *Cleveland* to cases

involving SSDI benefits; rather, it stated that the holding applies to a "plaintiff's previous sworn statement asserting 'total disability' or the like." 526 U.S. at 807. Murphey represented in his notarized application to the PERA that he was "total[ly] and permanent[ly] disab[led]," and that his impairment rendered him unable "to engage in any substantial gainful activity." Although this representation did not take the form of a sworn statement, the Court notes that individuals who give false information to the PERA are subject to criminal penalties under Minnesota law. Minn. Stat. § 353.19 (2000).

Second, the essence of the reasoning underlying *Cleveland* is that, in the absence of an explanation, an individual who has secured disability benefits under one federal law by representing that she is unable to work cannot turn around and seek damages under a second federal law by making the apparently inconsistent representation that she can perform the essential functions of her job, with or without reasonable accommodation. This reasoning applies with equal force to individuals who seek and obtain disability benefits under a state law.

Third, the eligibility requirements for SSDI benefits are virtually identical to the eligibility requirements for total and permanent disability benefits through the PERA. Under the Social Security Act, "disability" means "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A) (2000). Again, under Minn. Stat. § 353.01, subd. 19, the term "total and permanent disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to be of long-continued and indefinite duration[, which] means that the disability has been or is expected to be for a period of at least one year.

Finally, *Motley v. New Jersey State Police*, 196 F.3d 160 (3d Cir. 1999), supports the proposition that *Cleveland* extends to disability benefit programs established by state law. In that case, the ADA plaintiff, a former New Jersey State Trooper, had applied for and received accidental disability pension benefits through a program established by New Jersey law. *Motley*, 196 F.3d at 163-67. In his application, the plaintiff "declared that he was qualified for the enhanced disability pension benefits because he was 'permanently and totally incapacitated.'" *Id.* The decision does not indicate whether this was a sworn declaration. The Third Circuit applied *Cleveland* and affirmed summary judgment for the defendant employer on the ground that the plaintiff had failed to come forward with a sufficient explanation for the inconsistency between his two claims. *Motley*, 196 F.3d at 167. Based on these considerations, the Court concludes that it is appropriate to apply *Cleveland* to the representations Murphey made in his application to the PERA. Because of this conclusion, it is unnecessary to decide whether *Cleveland* also applies to Murphey's representations to U.S. Life, a private insurer.[3]

Under *Cleveland*, then, the Court must determine whether Murphey has proffered an explanation "sufficient to warrant a reasonable juror's concluding that, assuming the truth of, or [Murphey'] good-faith belief in, the earlier statements [to the PERA], [Murphey] could nonetheless 'perform the essential functions' of [his] job, with or without 'reasonable accommodation.'" 426 U.S. at 807.

Murphey made no attempt to offer such an explanation in his Memorandum in Opposition to Defendant's Motion for Summary Judgment or in his opposing affidavits, even though Minneapolis had argued in its Memorandum in Support of its Motion for Summary

---

[3] The parties did not provide any guidance on this issue, and the Court is unable to locate any reported cases addressing it.

Judgment that *Cleveland* and its progeny required him to do so. (Def.'s Mem. Supp. Summ. J. at 16-17.) Murphey's counsel did briefly address this issue at the hearing on Minneapolis's motion, offering three possible explanations in response to the Court's questioning. The first explanation related solely to Murphey's claims for total disability benefits from U.S. Life. Because the Court has not decided that Murphey is required to address these claims to avoid summary judgment, it will not consider this explanation.

Addressing the inconsistency between Murphey's ADA claim and his representations to the PERA, Murphey's counsel noted that Murphey "filled out [his application] in November of 1998, a full year before [he] was terminated. So, whether he was disabled at that point is a separate issue from whether he is [a qualified individual with a disability] at the time of his termination." On its face, this explanation merely reconstructs the chronology of relevant events and states the obvious fact that an individual who is unable to work at Time A is not necessarily unable to work at Time B. The explanation also implies, but does not actually assert, that Murphey's condition improved between November 1998 and November 1999. To withstand summary judgment under *Cleveland*, the plaintiff's explanation must be supported by the facts and evidence in the record. *See Lane*, 257 F.3d at 770 (rejecting ADA plaintiff's explanation because it was not factually supported by the record); *Moore*, 187 F.3d at 848 (same). Murphey's counsel did not cite to any evidentiary materials in the record that support his implicit suggestion that Murphey's condition improved between November 1998 and November 1999. Indeed, it appears from the record that Murphey himself has not endorsed the explanation offered by counsel. At his deposition, Murphey testified that his medical restrictions remained static between October 1997 and July 1999 (Murphey Dep. at 47, 97-98), and there is nothing in the record indicating that Murphey's condition improved between July 1999 and his termination in

November 1999. Thus, this explanation is not "sufficient to warrant a reasonable juror's conclusion that, assuming the truth of, or [Murphey's] good faith belief in, the earlier statement, [Murphey] could nonetheless 'perform the essential functions' of [his] job, with or without 'reasonable accommodation.'" *See Cleveland*, 526 U.S. at 807.

The final explanation presented by Murphey's counsel was the general assertion that the PERA does not take the possibility of "reasonable accommodation" into account when determining whether an individual is under a "total or permanent disability." In other words, it is possible that an individual found by the PERA to be under a "total or permanent disability" could still perform the essential functions of his job, albeit only with reasonable accommodation. As the Supreme Court stated in *Cleveland*, this same possibility exists in cases involving SSDI benefits. 526 U.S. at 803 (stating "when the [Social Security Administration] determines whether an individual is disabled for SSDI purposes, it does *not* take the possibility of 'reasonable accommodation' into account"). Some jurisdictions have concluded that a plaintiff cannot survive summary judgment merely by referring to this difference between the two statutory schemes. *Motley*, 196 F.3d at 165; *Felix v. N.Y. City Transit Auth.*, 154 F. Supp. 2d 640, 652 (S.D.N.Y. 2001) ("The difference in statutory schemes, in itself, is not enough to survive summary judgment in light of *Cleveland*."). As the Third Circuit explained in *Motley*:

> Obviously, this [difference is present] in all of the[] cases [to which *Cleveland* applies] and, if this argument alone allowed ADA plaintiffs who had previously applied for SSDI-type benefits to survive summary judgment, summary judgment could never be granted. Because the Supreme Court indicated [in *Cleveland*] that summary judgment would indeed be appropriate in some cases, an ADA plaintiff must, in certain circumstances, provide some additional rationale to explain the plaintiff's apparent about-face concerning the extent of the injuries.

*Motley*, 196 F.3d at 165. The Court finds that the reasoning of the Third Circuit is persuasive on this point, and it therefore concludes that Murphey's counsel's reference to the fact that the

PERA does not take into account the concept of reasonable accommodation is not sufficient to withstand summary judgment under *Cleveland*.

Because Murphey has not presented the explanation required by *Cleveland*, there is no genuine issue of fact as to whether he can perform the essential functions of his job, with or without reasonable accommodation. Thus, Minneapolis is entitled to judgment on Murphey's ADA claim as a matter of law. The Court's holding on this issue makes it unnecessary to address the parties' remaining arguments.

**CONCLUSION**

IT IS ORDERED THAT:

1. Defendant Minneapolis's Motion for Summary Judgment [Docket No. 11] is GRANTED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: September 27, 2002

JOAN ERICKSEN LANCASTER
United States District Judge

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

## CIVIL NOTICE

DATE MAILED TO COUNSEL/PRO SE PARTIES:

The purpose of this notice is to summarize the time limits for filing with the District Court Clerk's Office a Notice of Appeal to the Eighth Circuit Court of Appeals from a final decision of the District Court in a civil case.

***This is a summary only. For specific information on the time limits for filing a Notice of Appeal, review the applicable federal civil and appellate procedure rules and statutes.***

Rule 4(a) of the Federal Rules of Appellate Procedure (Fed. R. App. P.) requires that a Notice of Appeal be filed within:

1. Thirty days (60 days if the United States is a party) after the date of "entry of the judgment or order appealed from;" or

2. Thirty days (60 days if the United States is a party) after the date of entry of an order denying a timely motion for a new trial under Fed. R. Civ. P. 59; or

3. Thirty days (60 days if the United States is a party) after the date of entry of an order granting or denying a timely motion for judgment under Fed. R. Civ. P. 50(b), to amend or make Additional findings of fact under Fed. R. Civ. P. 52(b), and/or to alter or amend the judgment under Fed. R. Civ. P. 59; or

4. Fourteen days after the date on which a previously timely Notice of Appeal was filed.

If a Notice of Appeal is not timely filed, a party in a civil case can move the District Court pursuant to Fed. R. App. P. 4(a)(5) to extend the time for filing a Notice of Appeal. This motion must be filed no later than 30 days after the period for filing a Notice of Appeal expires. If the motion is filed after the period for filing a Notice of Appeal expires, the party bringing the motion must give the opposing parties notice of it. The District Court may grant the motion, but only if excusable neglect or good cause is shown for failing to file a timely Notice of Appeal.

C:\FORMS\APPEAL NO. CIV
Rev. August 11, 1995

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

### Prehearing Conference Program

The United States Court of Appeals for the Eighth Circuit has established an early intervention Prehearing Conference Program. The purpose of the program is twofold: (1) to facilitate settlement discussions in civil cases by providing an impartial atmosphere for an open discussion of the case and alternative methods of disposition and (2) to promote the delineation of issues, early resolution of procedural problems, and effective administration of an appeal throughout the appellate process. See 8th Cir. R. 33A.

The program is directed by Mr. John Martin. Mr. Martin screens newly filed appeals based on information furnished by both appellants and appellees in the court's Appeal Information Forms A and B. Contact with counsel is by telephone and in personal conferences held in several cities throughout the Circuit. All communications with Mr. Martin are confidential. Counsel can openly discuss and evaluate the issues and explore alternatives in a non-adversarial setting without fear that the subsequent processing of the appeal or ultimate disposition of the case will be adversely affected by participation in the program.

Participation in the program is voluntary. However, the Court strongly encourages your participation and cooperation. Over the past twenty years, the program has enabled many appellate litigants to achieve mutually satisfactory resolution of certain issues or an overall settlement prior to progressing through all stages of the appellate process. Issue delineation enables counsel to focus only on those issues that need judicial resolution. The program has helped relieve the ever-increasing caseload confronting the Court, and it has also saved litigants and attorneys substantial amounts of time and money.

In order for the program to function effectively certain information <u>must</u> be provided at the initiation of the appeal. *Eighth Circuit Rule 3B directs each civil appellant to: (1) file a completed Appeal Information Form A with the Notice of Appeal at the time the Notice is filed with the District Court clerk and (2) forward a copy of the completed Form A and a copy of Appeal Information Form B to the appellee for completion.* Appellee may complete Form B and send it to the clerk of the Court of Appeals. If you have any questions about the Prehearing Conference Program or the Appeal Information Forms, please contact Mr. Martin at (314)-539-3669.

Forms A and B are available from the District Court clerk and the Court of Appeals clerk and can be found at the Court of Appeals' web site at: www.ca8.uscourts.gov

*June 1, 2000*