UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

- - - - - - - - - - - - - - - - - - - - - - -

Robert K. Murphey, Jr., Civil File No. 01-10 (JNE/JGL)

Plaintiff,

**PLAINTIFF'S TRIAL BRIEF**

vs.

City of Minneapolis,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - -

## INTRODUCTION AND SUMMARY

### Summary of the Case

Bob Murphey served in the Marine Corps from 1967 to 1970 and was involved in numerous combat operations in Vietnam as an artillery gunner, both on land and in river boats. When his tour of duty ended, he began a lengthy career with the City of Minneapolis as a laborer. He worked for the City from 1971 until November 3, 1999, when he was discharged.

He was discharged, the City says, because he had not found a job within 120 days of being placed in its Job Bank Program. Under that program, employees unable to perform their regular job because of permanent medical restrictions are given 120 days to find, with the City's active assistance, a position they can perform. If not repositioned within that time period, they can be terminated.

The reason offered by the City for Murphey's termination – the only reason it has offered – is false. Two considerations prove so. First, Murphy did find another job within the 120 period. Only two weeks prior to his termination, Murphey was told by the City in the presence of many witnesses that his supervisors in Engineering Design were very satisfied with his work, that he was

doing an excellent job, and that he would continue to be employed by the City as an Engineering Aide I.[1] Thus, he had repositioned himself within the 120 period. Second, the City terminated him only 114 days into the 120-day Job Bank period. If fact, the primary contact person at the City for this purpose told Murphey his termination had been a mistake and would be reversed; it never was.[2]

## Summary of Damages

On November 14, 2003, four years after his discharge and while this matter was on appeal, Bob Murphey was placed on a "service-connected" disability by the Veteran's Administration. The decision was made retroactive to September 1, 2001. The disability is based on Post Traumatic Stress Disorder stemming primarily from his combat duty in Vietnam. The quintessential Marine, Murphey did his best to cope with his Vietnam-based PTSD as long as he could in the years since his return. It was the sudden death of his teenage daughter in June of 1999 in a tragic auto accident, and his discharge from employment five months later, that brought the PTSD to the fore, eventually causing him to seek assistance from the VA in April of 2001, two years later.[3]

It is not known how long this condition or Murphey's disability classification by the VA will last.[4]

---

[1] See the discussion of the Meeting of October 15, 1999, pp. 10-12, *post*.

[2] See the discussion of the Termination, pp. 12-14, *post.*

[3] Murphey was an artillery gunner on a river boat for part of his time in Vietnam. While he had many harrowing experiences, a particularly painful one occurred when villagers brought to the Americans bodies of dead villagers killed during an attack the night before. One of the bodies was that of a young girl, and Murphy believed it had been his bullets that killed her. The memory has always haunted him, and he believed that, at some point in his life, he would have to "pay" in some cosmic sense for this event (even though he had done nothing wrong). Such "payback" occurred, he believed, when he lost both his teenage daughter and his employment of 29 years in 1999. It took two years, but finally Murphy sought help.

[4] Lest the City argue that Murphey's VA benefits should be deducted from his back- and front-pay awards, the Court is directed to *Gaworski v. ITT Commercial Finance Corp.*, 17 F.3d 1104, 1112-113 (8th

**<u>Damage Analysis</u>: Assumes Murphey Will be Disabled by PTSD through Age 65.** This analysis assumes that Murphey was and will remain unemployable from September 1, 2001 onward.

Under PERA rules, one cannot receive disability benefits and retirement benefits simultaneously, and one does not accumulate years of service under PERA while on disability.

"Normal retirement age" under PERA is 65 for persons who became employed prior to July 1, 1989. (Minn. Stat. §353.01, subd. 37) Murphey's 65th birthday will be April 27, 2013.

Had Murphey worked from November 4, 1999, the day after his termination, through August 31, 2001, the day prior to his VA disability, he would have earned approximately $63,948.50.

Had he generated those earnings, his PERA disability benefit beginning September 1, 2001 would have been $693 per month. When he turns 65, his monthly benefit would change classifications from disability to retirement, but the amount would not change. His life expectancy under IRS tables is 27.7 years. Thus, from September 1, 2001 until death he would have received $230,353.20 ($693 x 12 x 27.7) in PERA disability and retirement benefits.

As things stand, having been terminated in November of 1999 and not having worked since, Murphey can elect to receiving his PERA benefits beginning May 1, 2005, and will receive [to be supplied].[5] He is no longer eligible to receive PERA disability benefits.

---

Cir. 1994), *cert. denied*, 513 U.S. 946, where it is made clear that, in this Circuit, benefits received from collateral sources (such as unemployment benefits, worker's-compensation payments, social-security benefits, and the like) are <u>not</u> deducted from back-pay awards in employment-discrimination cases. The same rationale obviously applies to VA benefits and front-pay awards. A motion in limine on this issue is being served and filed herewith.

[5] The parties are working with PERA to establish agreed-upon figures under various scenarios. As of the time of submission of this brief, this figure was not yet available.

Emotional-distress Damages ($300,000). Murphey was 51 at the time of the discharge. He lost his salary, insurance coverage, his only job for the past 29 years, and his pride. He had no idea how he would be able to support himself or his only surviving minor child. It is not difficult to imagine how a 29-year-veteran of City employment, and a veteran Marine who served his country with courage and dignity, would feel after such treatment. He had given many years to the City and injured himself doing so, and the City cast him aside as damaged goods on the flimsiest of pretexts. Now, more than five years later, he will finally have his day in court. The plaintiff will seek the statutory cap of $300,000 for this element of damages.

## Procedural History

After obtaining the Right to Sue from the EEOC, Bob Murphey commenced this action in Hennepin County District Court in December of 2000 alleging claims of discrimination in violation of the Americans With Disabilities Act. The City removed the case to this Court. Rounds of written discovery were exchanged and seven witnesses deposed. Discovery ended in March of 2002, three years ago.

The City moved for summary judgment that same month. The summary-judgment hearing was held August 5, 2002. On September 27, 2002, this Court granted the City's motion and dismissed Murphey's claims. In February of 2004, the Eighth Circuit Court of Appeals reversed. *Murphey v. City of Minneapolis*, 358 F.2d 1074 (8th Cir. 2004). On remand, the City requested that the Court consider alternative grounds for summary judgment. The Court did, and denied the City's motion in its entirety on November 23, 2004.

The case is second on the trial calendar beginning April 5, 2005.

## DETAILED SUMMARY OF THE FACTS[6]

**Introduction.** After graduating from South High School in Minneapolis and attending technical school and junior college, Bob Murphey enlisted in the Marine Corp, where he served from 1967 to 1970, an enlistment which included a combat tour in Vietnam. (Murphey Dep. 6-7, 210) He was in the infantry, spent seven months on river boats while in Vietnam, and was awarded a Purple Heart after being hit with shrapnel in an explosion. (Dep. Ex. 5, second page [bottom: "Military Service"].)

In 1971, Murphey was hired by the City of Minneapolis as a laborer in the Department of Public Works; he remained employed there for the next 29 years. (*Id*. 9-10; Answer, para. 3; Dep. Ex. 19) His employment ended when he was discharged on November 3, 1999. (Answer, para. 3; Dep. Ex. 19) That discharge, and the events immediately preceding it, led to this litigation.

**Relevant Work History and On-The-Job Injuries.** After his 1971 hiring and a temporary placement in the Sanitation Department, Murphey was transferred to the City's Paving Department in 1972. (Murphey Dep. 11-12) His work in that department involved many different tasks, including shoveling, digging, lifting, raking, working with concrete and asphalt, and the like. (*Id*. 10 & 12)

He sustained several on-the-job back injuries over the years, the first in 1977 while lifting a 200-pound iron casting. (*Id*. 22) He suffered additional back injuries (or re-injuries) in 1987, 1995, 1996, and 1997, all during episodes of heavy lifting. (*Id*. 21-26) On each occasion, after taking time to recover, he was able to return to work.

---

[6] This summary of the facts and the law is based upon the summary in the plaintiff's summary-judgment memorandum.

The 1997 injury occurred in May when Murphey re-injured his back dragging large water hoses up an incline. (*Id*. 26-28) Off work for 3-4 weeks, he returned to the Ramps Department as a painter's assistant, a part-time, light-duty, position. (*Id*. 28-29) In October of 1997, when his available medical leave and vacation time had been exhausted, the City placed him on worker's compensation. (*Id*. 31, 45, 47)

In 1998, he was placed in several part-time, light-duty positions, one sorting water bills in the Finance Department (*id*. 56), and another working as a janitor in the Lands and Building Department (*id*. 67). A disagreement developed between Murphey's doctor, who told him he should not be doing that kind of janitorial work at that time — the job involved repeated bending to pick up hundreds of cigarette butts outside the building — and the City's doctor, who approved the position. (*Id*. 67-70, 72, 75, 79) Murphey did the work for 6-8 weeks, but in October of 1998, was unable to continue. (*Id*. 67-68, 80)

Mary Page, a Human Resources generalist employed by the City, met with Murphey on October 13, 1998 and attempted to enter him into the City's Job Bank program. (*Id*. 80-81) Under that program, Murphey was told, if his janitor's job did not evolve into a full-time position within 120 days, he would be terminated. (*Id*. 80-81) Murphey objected to entering the Job Bank (*id*. 84), and the City, having no position within his restrictions, could not place him in the program at that time.[7] On October 13, 1998, after her meeting with Murphey, Page noted the following:

---

[7] *See* Ryan Aff., Ex. A (Document No. 04111 [top]: E-mail from Mary Page dated October 6, 1999): "Last year (1998) we attempted [emphasis in original] to bring him into Job Bank for several months . . . [W]e needed to find him a job assignment before we could bring him into Job Bank". It is undisputed that, before an employee can enter the Job Bank, the City must find him (or her) a job to perform. (Page Dep. 61-62, 63; Spann Dep. 15, 17, 34, 35; Ross Dep. 26-27.)

> [Murphey] does NOT [emphasis in original] want the job bank 120 days to start, as he believes the City is trying to "get rid of him". I am caught in the middle on this, and feel very uncomfortable meeting with or dealing with Bob, without a representative from Work Comp present.[8]

Unable to get Murphey into the job bank, the City discontinued his worker's-compensation benefits. (*Id*. 84) Murphey appealed that determination, and later obtained a reversal from the worker's compensation court, and his benefits were restored. (*Id*. 84)[9]

On October 28, 1998, Katherine O'Neill, head of the City's Return to Work program,[10] inquired of those handling the Murphey case whether the City could simply discharge him immediately.[11] (Murphey was not discharged, and continued on worker's compensation.)

In March of 1999, Murphey spent three weeks in the Chronic Pain Rehabilitation Program at Abbott Northwestern Hospital. Near the conclusion of his stay, the Medical Director of the program sent a letter to the City stressing Murphey's interest in returning to work and his ongoing concerns about the Job Bank program. The Medical Director stated in relevant part as follows:

> From our vantage point, both my staff and I feel that Mr. Murphey has worked extremely hard in the pain program. We have found him to be a very sincere, extremely motivated and intelligent individual. . .

---

[8] Ryan Aff., Ex. B (Document No. 03994 [bottom]: E-mail from Mary Jauman [n/k/a Mary Page] dated October 13, 1998).

[9] Minneapolis was self-insured for workers compensation in 1998-99 (Ross Dep. 34-35), and it was, as the City's own worker's-compensation coordinator admits, to the City's financial benefit to get injured employees back to work or off the payroll as soon as possible (*id*. 38-39, 46).

[10] Page Dep. 56-57; Ross Dep. 19.

[11] Ryan Aff., Ex. C (Document No. 04016: E-mail from Katherine O'Neill to Mary Jauman [n/k/a Mary Page] dated October 28, 1998), O'Neill stating: "[C]an the city terminate him now?". No e-mail responsive to O'Neill's inquiry was produced to the plaintiff by the City, but the record is clear that Murphey was not terminated at that time.

> As indicated, during the three weeks, we found Mr. Murphey to be extremely compliant . . .
>
> Mr. Murphey made it quite clear to us that he is extremely motivated about returning to work with the City of Minneapolis. My hope is that you and the people there can facilitate this. We have completed restrictions that represent what the patient was capable of doing while here in the pain program. Obviously, he does have some restrictions and my expectation is that these restrictions will indeed be permanent.
>
> In talking with Mr. Murphey and his QRC they both have expressed concerns about the job pool mechanism that the City of Minneapolis has in place. I would certainly encourage you, as we discussed on the phone, to try and support Mr. Murphey in finding an appropriate light duty position once he is discharged from the Chronic Paid Rehabilitation Program. . .[12]

On April 30, 1999, Nancy Ross sent an e-mail to Mary Page noting that it had been some time since they had addressed the Murphey situation, inquiring whether Page would "see what might be available for Murphey to get him in to job bank", and suggesting that "[o]nce a position has been identified for Murphey, I think it would be helpful to have his supervisor or perhaps [another supervisor] send a letter out to him stating that failure to cooperate with the job bank program will result in disciplinary action."[13]

Page responded a few days later, stating "Hi Nancy. I can hardly wait to start working on this again!"[14] A few weeks later Page noted that she was "getting a lot of pressure from Nancy Ross in

---

[12] Ryan Aff., Ex. D (Document No. 04024: Letter dated March 26, 1999 from Matthew Monsein, M.D. to Nancy Ross of the City of Minneapolis).

[13] Ryan Aff., Ex. E (Document No. 00858 [bottom]: E-mail dated April 30, 1999 from Nancy Ross to Mary Page).

[14] *Id.* (middle). That irony underlay Page's remark about being anxious to get back to work on the Murphey case is supported by her deposition testimony that she found Murphey difficult to work with: " . . . I think Mr. Murphey threw a few things in there that made it difficult to work with him." (Page Dep. 118)

Work Comp to get [Murphey] a placement and start the ball rolling"[15], an impression confirmed by a subsequent e-mail from Ross to Page that "[t]he sooner the better to get Robert Murphey into the Job bank . . .".[16]

At that time the Public Works Department employed approximately twenty Engineering Aide I's, and there were three to four vacancies for that position. (Page Dep. 77) Murphey told Page he was interested in the job, and Page made the appropriate inquiries. (Page Dep. 80, 83; Murphey Dep. 94) By June of 1999, arrangements had been made for Murphey to start in Engineering Design.[17]

Murphey's beginning work as an Engineering Aide I was delayed by the death of Murphey's daughter on June 9, 1999.[18]

**Placement in the Job Bank (July 12, 1999).** In a letter dated July 6, 1999, Murphey was advised that he was to begin work "in an Engineering Aide I position" in the Engineering/Design Division, and that his job would start on July 12, 1999. (Dep. Ex. 16)

Beginning on July 12th, and for the next 3½ months, Murphey was able to perform all the tasks assigned to him in the Engineering Aide I position, and to do so within his medical restrictions. (Murphey Dep. 97)

On October 4, 1999, Mary Page reported in an e-mail to various other City employees involved in the Murphey case that Murphey's superiors in Engineering Design had recently told her

---

[15] Ryan Aff., Ex. F (Document No. 04063: E-mail from Mary Page dated May 25, 1999).

[16] Ryan Aff., Ex. G (Document No. 04066 [top]: E-mail from Nancy Ross dated May 28, 1999).

[17] Ryan Aff., Ex. G (Document No. 04066 [middle]: E-mail from Mary Page dated May 26, 1999).

[18] On June 7, 1999, a vehicle in which Murphey's teenage daughter was a passenger overturned, and she suffered massive head trauma. (Murphey Dep. 194-95) She died two days later when life support was removed, a decision which had to be made by Murphey. (*Id.*) The driver had been intoxicated and was convicted of criminal vehicular homicide. (Murphey Dep. 195)

"that Bob has a good work ethic, that he's got a good attitude, and he does a good job at what he's doing", and that they were willing to employ him in the department as an Engineering Aide I if he completed certain course work. (Dep. Ex. 18, second page) Two days later, one of the recipients of that e-mail wrote back to Page, stating as follows: "Since PW [Public Works] is willing to give him a try contingent on his passing the required course, do you think they, the department[,] would be willing to pay his salary?"[19] (These e-mails were exchanged only between City employees; Murphey was unaware of their existence or contents until they were produced in discovery.)

**Meeting of October 15, 1999.** A meeting was held on October 15, 1999 to address Murphey's status in the Engineering Aide I position and his prospects for continued employment by the City. (Murphey Dep. 117) In attendance were Murphey, Tom Mottaz (Murphey's worker's-compensation attorney), Nancy Ross, Mary Page, and Ed Backstrom (a City attorney). At that meeting, Murphey was told that his supervisors in Engineering Design were very satisfied with his work, that he was doing an excellent job, and that he would continue to be employed by the City as an Engineering Aide I. (Murphey Dep. 114-120) Murphey was also told that his superiors had suggested that he take certain courses to enhance his skills. (Murphey Dep. 115, 117-18) No one said anything about Murphey having to take any course work as a condition of his continuing to work as an Engineering Aide I. (*Id*. 118, 121) While no one used the word "guaranty" or "guaranteed" in describing his employment with the City (*id*. 115), it was his clear understanding from the meeting that the requirement that a job be found within the 120-day Job Bank period had

[19] Dep. Ex. 18, first page (middle): E-mail from Bob Etzioni to Mary Page, October 6, 1999. Etzioni noted earlier in that message that he "sometimes forget[s] that Bob Murphey is being paid out of RTW [Return to Work] funds" and that Etzioni was "becoming 'antsy'" because of the ongoing cost. After posing a number of questions about the future of the Murphey case, Etzioni concluded his message by saying "I think this one is going to haunt us." (*Id*.)

been met, that the 120-day period had stopped running, and that he no longer faced termination under the 120-day Job Bank rule (*id*.180-81). He was told "all systems were go; everything was in place; that I was dong a perfectly wonderful job as an Engineering Aide I; that I was to continue working as an Engineering Aide I and that they were going to supply me with some skill enhancement classes to facilitate my being able to move up the ladder." (*Id*. 117-18)

In her deposition, Page testified as follows:

- that "I don't recall who said what about anything" in September and October of 1999, and specifically not about what was said to Murphey or others about the Engineering Aide I job (Page Dep. 89-91)

- that "I don't have a clue" what the strongest language she used was to describe Murphey's job situation in October of 1999 with respect to the Engineering Aide I position (*id*. 89)

- that she had been working hard to get Murphey hired permanently in the Engineering Aide I position, and that that was her attitude through the date of Murphey's termination (*id*. 91)

- that Murphey might well have believed based on what occurred at the October 15th meeting that he was going to be allowed to continue in the Engineering Aide I position (*id*. 90-91)

- that she had no recollection of telling Murphey, his attorney, or his QRC at the October 15th meeting or at any other time that, despite the all the developments with the Engineering Aide I position, the 120-day requirement had not been satisfied and that Murphey faced termination unless he found another job with the City in the next two weeks (*id*. 91-94)

Nancy Ross testified that she could not recall anyone telling Murphey or his attorney at the October 15th meeting that, despite the news about the Engineering Aide I position being conveyed to Murphey at that meeting, the 120-day Job Bank period was continuing to run and he faced termination in a couple weeks if a different job were not found for him. (Ross Dep. 78-80) When asked whether or not she believed Murphey had grounds for feeling misled by this, she replied "I

don't know". (*Id*. 80-81)

Ed Backstrom, the City attorney who also attended the October, 1999 meeting, testified that he took no notes at the meeting, could not recall what was said by anyone at the meeting, could not recall the purpose or outcome of the meeting, and knew of no document or anything else which would refresh his recollection. (Backstrom Dep. 19-29)

**Termination (November 3, 1999).** In a letter dated November 3, 1999, Murphey was informed that "your Job Bank 120-period was completed on November 2, 1999" and that "[s]ince a placement did not occur prior to November 2, 1999, this is notification that you are being released from City service . . ." (Dep. Ex. 19)

(In fact, Murphey was terminated after only 114 days in the Job Bank. The 120-day period had not begun running until July 12, 1999, Murphey's first day of actual work in the Engineering Aide I position. The 120th day after July 12th was November 8, 1999.)[20]

Murphey was very surprised to receive this letter. (Murphey Dep. 180) He had spoken with Mary Page just the day before its receipt; she had called to tell him his skills-enhancement classes were being scheduled and she would soon let him know their time and location. (*Id*. 180-81) She had said nothing in that call about his having been or being terminated.

The termination letter was signed by Aurelia Spann, a Human Resources associate. (Dep. Ex. 19; Spann Dep. 6-7) Spann played no role in Murphey's termination other than performing the

---

[20] Every deponent in a position to know how the Job Bank operated testified (a) that one could not be placed in the Job Bank until a position were found for the employee, and (b) that the 120-day period did not begin running until the employee actually started working in the position. (Page Dep. 61-62, 63; Spann Dep. 15, 17, 34, 35; Ross Dep. 26-27) It is undisputed that Murphey did not begin work as an Engineering Aide I until July 12, 1999. (*See* Dep. Ex. 16 [letter notifying Murphey that he was to commence work at Engineering Aide I on "Monday, July 12, 1999"].) The calendar attached as Exhibit H to the Ryan Affidavit shows that the 120th day after July 12, 1999 (with July 12th being Day 1) was November 8, 1999.

clerical tasks of composing and signing the termination letter. (Spann Dep. 13) Spann calculated the end of the 120-day Job Bank period (i.e., the termination date), but did so based on Page's representation to her that the 120-day period had commenced on July 6, 1999. (Spann Dep. 15, 38, 39) Spann knew that the 120-day period would not commence until Murphey's first day of work, but believed based on what Page told her that his first day of work had been July 6th rather than his actual start date of July 12th. (*Id*. 15, 34, 35, 38, 39)

When Murphey received the termination letter, he called Mary Page, told her he had received the letter, and asked for an explanation. (Murphey Dep. 180-81) As Murphey recalls, she became "slightly agitated", told him the termination was "a mistake" and that she had to speak with Nancy Ross. (*Id*. 181) He never heard from Page again. (*Id*.)

Murphey began working with his worker's-compensation attorney and the QRC at that point to undo the termination. (*Id*. 182) He was told by City employees, the QRC, and his attorney that he should just continue to work in the same position and that the termination would be reversed. (*Id*. 182-83)

After Murphey received the termination letter, the QRC, Frank Samlaska, contacted Nancy Ross. (Samlaska Dep. 66-70) Samlaska told Ross that he thought the running of the 120-day period had been suspended by virtue of the Engineering Aide I discussions. (*Id*. 67) He felt that his "trust" had been "violated", and was angered by the termination. (*Id*. 67) Samlaska testified: "The vocational rehabilitation plan at that time -- and she [Nancy Ross] was in agreement with it, and she was fully aware of it -- was to try to keep Mr. Murphey on a full-time, permanent basis with the City of Minneapolis as an Engineering Aide I. . ." (*Id*. 49) Samlaska testified that he had been in regular contact with the City in September and October of 1999, that the City had made it clear they were

going to continue to employ Murphey as an Engineering Aide I, and that no one had told him that this arrangement would not or did not satisfy the 120-day Job Bank requirement. (*Id*. 49-52) Once Murphey was terminated, Samlaska concluded that the City had not been dealing with him or Murphey in good faith. (*Id*. 51-52)

**Evidence of "Disability".** Frank Samlaska is a qualified rehabilitation consultant licensed by the Minnesota Department of Labor & Industry. (Samlaska Dep. 4) He is also a vocational expert. (*Id*.) He provides services to employers and others through his business, Samlaska Rehabilitation Services. (*Id*.)[21] He holds a B.A. in psychology and a master's degree in counseling education with an emphasis on vocational rehabilitation. (*Id*. 13) His licensure by the Department of Labor & Industry enables him to provide rehabilitation services to injured workers. (*Id*. 13-14)[22]

He has served as a QRC in 700-800 cases covering a broad range of injuries, and has frequently testified as an expert at disability hearings in Social Security cases on the issue of whether a person is able to perform substantial gainful activity. (*Id*. 19-24, 26)

When engaged as a QRC, Samlaska must review all the relevant medical records, interpret the records to determine the medical restrictions to which the worker is subject, and form an opinion as to the worker's employability. (*Id*. 22-27) Back injuries were the primary kind of injury with

---

[21] Samlaska's curriculum vitae is Deposition Exhibit 3 and his testimony on his background and qualifications appears on pages 4 through 21.

[22] The City suggests that an expert report was needed in order for the plaintiff to use Samlaska as an expert. (*See* Defendant's Memorandum, p. 12) Not true. "The requirement of a written report . . . applies only to those experts who are retained or specially employed to provide [expert] testimony in the case or whose duties as an employee of a party regularly involve the giving of such testimony. A treating physician, for example, can be deposed and called to testify at trial without any requirement for a written report." Advisory Committee Notes to the 1993 amendment to Subdivision (a), Paragraph (2) of Rule 26 of the Federal Rules of Civil Procedure, *reprinted at Federal Civil Judicial Procedure and Rules* at 153 (West 2002).

which he has dealt over the course of his career, and he is familiar with the difficulties persons with back problems have in getting back to work. (*Id*. 26-27)

Samlaska became involved in the Murphey case in September of 1999 when the parties asked him to function as the QRC in the Murphey worker's-compensation case. (*Id*. 27-29) Samlaska described Murphey as suffering from three primary medical conditions at that time: (1) a low-back injury involving disks, (2) chronic muscle strain, causing spasms in his lower back, and (3) depression, caused in large part by the sudden death of his daughter in June of 1999. (*Id*. 39-40) His medical restrictions at that time included 10- and 20-pound lifting restrictions as well as sitting, standing, and walking restrictions, with occasional to frequent position changes being required. (Dep. Ex. 6; Dep. Ex. 5, page 2 [third paragraph])

In the course of serving as Murphey's QRC, Samlaska became familiar with the "training, skills, and ability" Murphey brings to the marketplace (Samlaska Dep. 41), and that those characteristics qualified Murphey to perform a wide range of jobs, including all kinds of construction work, factory work, warehouse work, auto-shop work, truck driving, as well as all the kinds of work Murphey did for the defendant over his 29-year career (*id*. 43-46). Samlaska testified that in the course of his career, he had become familiar with people having "comparable training, skills, and ability" to those possessed by Murphey, and that, compared to those comparably-situated others, Murphey's physical condition significantly restricted his ability to work. (*Id*. 45-46) He testified that Murphey's physical restrictions precluded him from working in a wide range of jobs numbered in the thousands and spanning several classes or categories of jobs. (*Id*. 46-47)

> Q: [I]f you take the average person who has comparable training, skills, and abilities to those possessed by Mr. Murphey, do you have an opinion as to whether or not the restrictions to which Mr. Murphey was subject in September through November of

1999, whether – whether his physical condition, such as it was, significantly restricted his ability to work compared to the average person with comparable skills?

A: Yes.

Q: [H]ow so?

[Objection based on speculation omitted]

A: . . . Those lists, the jobs that we went through, based on the physical restrictions and my familiarity with the job requirements of those jobs that we listed, three-fourths of them would have been eliminated by those – by the physical restrictions that Mr. Murphey had.

Q: . . . [I]s it fair to say that the list of jobs that we discussed a short time ago consisted of classes of jobs, categories of jobs?

A: Class – Yes.

Q: And that underneath each class or category there would be enumerable [should be "innumerable"] specific jobs that would fall in to that group?

A. Thousands, yes.

(Samlaska Dep. 46-47)

## GOVERNING LEGAL PRINCIPLES

**Introduction.** Two ADA decisions establish a set of propositions of particular relevance to the instant case, namely, *Smith v. Midland Brake, Inc.*, 180 F.3d 1154 (10th Cir. 1999) and *Cravens v. Blue Cross & Blue Shield,* 214 F.3d 1011 (8th Cir. 2000).

First, an employee need not use any "magic words" to express a desire to be placed in another position for purposes of the ADA, but must simply "convey to the employer a desire to remain with the [employer] despite his or her disability and limitations." *Smith* at 1172 (citation omitted). Once the employee provides such an indication to the employer, the employer must engage in the "interactive process" contemplated by the Act, and do so "in good faith". *Id.* In the case of a large

employer, this obligation requires the employer to take the initiative to identify jobs which are appropriate for reassignment consideration. *Id.* at 1173. An employer's obligation is not met simply by identifying open positions and "allowing a disabled person to compete equally with the rest of the world for a vacant position". *Id.* at 1165. Far more is required; if the disabled person is able to perform the essential functions of the vacant position (with reasonable accommodation or without), he or she must be reassigned to that job, even if the disabled employee is not the best qualified person for the job. *Id*. at 1165 & 1169.[23]

Second, an employer policy which restricts or limits transfers may not override the employer's ADA obligations. *Smith* at 1176. Specifically, an agreement between a disabled employee and his employer that the employee will be given a limited period of time (in *Cravens*, 10-12 weeks) to locate another position in the company or face discharge, *does not* override the employer's obligations under the ADA.[24] In *Cravens*, the Court reversed summary judgment and reinstated the ADA discrimination claim even though the employee was told she would be retained in her light-duty position for 10-12 weeks in order to provide her sufficient time to locate another position in the company within her restrictions, and her termination resulted from her inability to do so within the allotted period. In reinstating the plaintiff's claim, the Court noted that the evidence

[23] "[A]n employer discriminates against a qualified individual with a disability if the employer fails to offer a reasonable accommodation. If no reasonable accommodation can keep the employee in his or her existing job, then the reasonable accommodation may require reassignment to a vacant position so long as the employee is qualified for the job and it does not impose an undue burden on the employer. Anything more, such as requiring the reassigned employee to be the best qualified employee for the vacant job, is judicial gloss unwarranted by the statutory language or its legislative history." *Smith*, 180 F.3d at 1169.

[24] *See also* 29 CFR §1630, App. §1630.6 ("An employer or other covered entity may not do through a contractual or other relationship what it is prohibited from doing directly . . . [I]t would be a violation for an employer to participate in a contractual relationship that results in discrimination against the employer's employees with disabilities in hiring, training, promotion, or in any other aspect of the employment relationship.").

suggested there may have been several positions which the plaintiff could have filled (even though the plaintiff was unaware of, and did not identify, those positions at the time), and the employer made inadequate efforts to identify those positions and transfer the plaintiff to one of them.

## I. THE PLAINTIFF IS "DISABLED" UNDER THE ADA.

The defendant concedes that the plaintiff has an "impairment", but contends his impairment does not substantially limit a major life activity. The law and the facts are to the contrary.

In *Burns v. Coca-Cola Ent., Inc.*, 222 F.3d 247, 252, (6th Cir. 2000), the appellate court held that the plaintiff was "disabled" under the ADA where his back problems resulted in a 23-pound lifting restriction which precluded him from performing half the jobs he was qualified to perform, jobs which, because of the plaintiff's age, education, and experience, all involved medium to heavy lifting and other forms of manual labor. In so ruling, the *Burns* Court provided a nice summary of the general legal principles which apply to the instant case, particularly with respect to the issue of whether or not the plaintiff has a "disability":

> The ADA prohibits an employer from discriminating against a qualified individual with a disability because of that individual's disability. *See 42 U.S.C. § 12112*(a); *McKay v. Toyota Motor Mfg., U.S.A., Inc., 110 F.3d 369, 371 (6th Cir. 1997).* An individual is considered "disabled" under the ADA if he or she:
>
> (A) [has] a physical or mental impairment that substantially limits one or more of [his or her] major life activities ... ;
>
> (B) [has] a record of such impairment; or
>
> (C) [is] regarded as having such an impairment.
>
> *42 U.S.C. § 12102*(2). The regulations accompanying the Act define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). The term "substantially limits" with respect to an individual's ability to work is also defined in the regulations:
>
> The term *substantially limits* [emphasis in original] means significantly

> > restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.
>
> 29 C.F.R. § 1630.2(j)(3)(i).

*Burns v. Coca-Cola Ent., Inc.*, 222 F.3d 247, 252, (6th Cir. 2000).[25] As the *Burns* Court noted later in its opinion:

> Although the regulations do not define the terms "class of jobs" or "broad range of jobs," the Appendix to Part 1630 provides examples of relevant limitations, notably:
>
> > An individual who has a back condition that prevents [him] from performing any heavy labor job would be substantially limited in the major life activity of working because [his] impairment eliminates his . . . ability to perform a class of jobs. This would be so even if the individual were able to perform jobs in another class, e.g., the class of semi-skilled jobs.

*Burns* at 254, *quoting DePaoli v. Abboott Laboratories*, 140 F.3d 668,672-73 (7th Cir. 1998), *in turn quoting* 29 C.F.R. Pt. 1630, App. §1630.2(j).

The task of raising a fact issue concerning whether the plaintiff is "significantly restricted" with respect to a class or broad range of jobs is not onerous, as is illustrated by the ruling in *Quint v. A.E. Staley Mfg. Co.*, 172 F.3d 1 (1st Cir. 1999). In that case, it was held that a physician's rather sparse testimony on cross-examination that the plaintiff's restrictions "'probably preclude a lot of physical jobs', and that 'there are a lot of physical jobs in Maine'" was, *on its own*, "sufficient to generate a triable issue of fact" on the question of whether or not the plaintiff was substantially limited in the area of working and, thus, disabled. *Id*. at 12.

---

[25] *See also Moysis v. DTG Datanet*, 278 F.3d 819, 825 (8th Cir. 2002) (affirming the trial court's judgment based on a jury verdict for plaintiff in ADA case, and recognizing and discussing working as a major life activity).

The evidence in the instant case is more than adequate to establish this element. Frank Samlaska, a licensed QRC and vocational expert, is very familiar with Murphey's educational and employment background and skills, as he is with Murphey's medical condition and limitations; as an expert who has worked in the field for more than 20 years and testified as an expert witness over 1,000 times, Samlaska is also familiar with the kinds of jobs available to a person with Murphey's background and with the physical and other qualifications a successful applicant must have to get those jobs. (*See* Samlaska Dep. 12-27.) Samlaska testified that Murphey's physical restrictions disqualified him from "thousands" of jobs in a broad range of categories, or nearly 75% of the jobs which would otherwise have been available to him. (*Id.* 46-47)

Clearly, the plaintiff has a "disability" under the ADA.

## II. THE PLAINTIFF WAS A "QUALIFIED DISABLED PERSON" UNDER THE ADA.

**Engineering Aide I Position.** The plaintiff had the essential qualifications for the position of Engineering Aide I. The job description produced by the City for that position provides that a successful applicant must have a "minimum of 18 months paid experience and/or education in civil engineering-related drafting, office calculation and surveying". (*See* Dep. Ex. 44: "Requirements: Experience/Education".) The defendant's attorney questioned the plaintiff at length about whether or not he met the position requirements as set forth in that job description, and the plaintiff's testimony established that he did. (*See* Murphey Dep. 125-134; Dep. Ex. 44) During his many years in the Paving Department, the plaintiff had:

- spent "thousands of hours" reading blueprints (Murphey Dep. 126-27)
- spent "thousands of hours" assisting surveyors with grade setting and performing the

necessary calculations (*Id*. 128)[26]

- spent "thousands [of hours]" doing civil engineering-related drafting and calculations, including coordinate geometry calculations (*Id*. 129-132)

While working in the Paving Department, Murphey testified, he spent 90 percent of his time doing engineering type work, and only 10 percent on actual physical labor. (*Id*. 134) When asked if he believed he had at least 18 months experience in all of the required areas listed on the job description, Murphey replied: "I have over 18 *years* of experience". (Murphey Dep. 133 [emphasis added])

Murphey was also questioned about whether or not he was performing these types of tasks (*i.e.*, those listed on Dep. Ex. 44 [the Engineering Aide I job description]) from July 12th onward, when he was working in the Engineering Aide I position, and his testimony, which covered in detail the tasks he had been performing in that position, established that he was. (*Id*. 150-54)[27]

While the City now contends that the position the plaintiff was actually performing at the time of his discharge was not an Engineering Aide I position, that is not what the record shows. Deposition Exhibit 16, the letter of July 6, 1999 which informed Murphey that he was being placed in the Job Bank, described the job he was to start on July 12, 1999 as "an Engineering Aide I position". It also referred to an attachment to the letter as listing "some of the duties that you will be performing as an Engineering Aide I". (Dep. Ex. 16)

---

[26] In fact, the plaintiff was a "senior grade setter" with the City during part of a 10-year stretch he worked as a grade setter for the Paving Department. (Murphey Dep. 128)

[27] The only item on the job description he was not doing regularly was working with "CAD" (computer-assisted drafting). (Murphey Dep. 150-51) He was being trained on the job to handle those tasks. (*Id.*) It should be noted, however, that the City's job description itself indicates that CAD skills were not an essential qualification for all Engineering Aide I positions. (*See* Dep. Ex. 44, which provides that only "[s]ome positions require CAD experience or training".)

As the factual summary set forth earlier in this memorandum establishes, Murphey was doing an excellent job in the Engineering Aide I position from July 12, 1999 onward. The record also shows that he was performing the essential functions of the job he was actually performing at the time of his termination, whether that job was the Engineering Aide I position (as Murphey contends) or a modified version of that job (as the City contends). (*See* Samlaska Dep. 112-14.) Finally, the record shows that there was additional work to be done in that job after Murphey was terminated; in fact, the City "hired" Murphey to do precisely the same kind of work he had been doing prior to his "termination", but on a "permit", employment-at-will basis. (Samlaska Dep. 52-54, 114; *see also* Dep. Ex. 42: "Engineering Services has plenty of work for you to do under the current permit arrangement for the next several months.")

Clearly, Murphey was a qualified disabled person with respect to the Engineering Aide I position at the time of his termination. He was in the position, doing an excellent job, and the City continued to use him to do the very same job after he was terminated. The only thing which changed was that he was no longer a permanent employee of the City, and had no job security, benefits, or seniority, and was being paid far less for doing precisely the same work he had been doing prior to his discharge.

**Other Positions Identified in the Complaint**. In Paragraph 12 of his complaint, Murphey identified numerous other positions with the City which he was able to perform, with or without accommodation, at the time of his termination, including the positions of tag person, grade setter, dump master, utility driver, painter's assistant, and many others. Samlaska agreed. (*See* Samlaska Dep. 115-16 and Dep. Ex. 12) Samlaska testified that, at the time of Murphey's termination, Murphey was able to work as a tag person (*id*. 120), a grade setter (*id*. 124), a flag person (*id*. 124),

a dump master (*id*. 124-26), a utility driver (*id*. 126-28), and a painter's assistant (*id*. 128-132), and would have been able to fill any of the hundreds of clerical positions which exist at the City (*id*. 131-33). Samlaska also testified that the City never offered Murphey any of these positions prior to terminating him in November of 1999. (*Id*.)

Mary Page conceded that there "probably were" vacancies in the laborer position during the period Murphey was in the job bank, but that she did not consider him for any of those positions because she believed a determination had already been made that Murphey could never again work as a laborer in any capacity. (Page Dep. 98-99)[28] She admits she did not do any kind of formal analysis of whether Murphey's restrictions could have been accommodated to enable him to work as a laborer. (Page Dep. 99)[29] Murphey, who actually performed all of these jobs throughout his entire career and knows what they in fact involve, knows that he could have performed the ones he identified, and done so with or without reasonable accommodation to his restrictions (Dep. Ex. 12), a position also held by Samlaska, the sole expert in the case (Samlaska Dep. 115-16 & 120-133).

Thus, the evidence shows that Murphey was qualified to perform the Engineering Aide I job he was in fact performing at the time of his termination, and many other identified positions he had performed in the past. He is clearly a "qualified individual with a disability" under the ADA.

---

[28] *See also* Samlaska Dep. 117-18, 120-21, 128 (positions open during job bank period).

[29] Page testified that she believes she did an informal one, by pulling an essential functions study for the general position of laborer and deciding that no reasonable accommodation could be made. (*Id*. 98-102)

## III. THE DEFENDANT BREACHED ITS DUTIES TO PROVIDE REASONABLE ACCOMMODATION AND TO ENGAGE IN AN INTERACTIVE PROCESS WITH THE PLAINTIFF IN GOOD FAITH.

Once the employer knows that a disabled employee wants to remain employed despite his or her disability, the employer must engage in the "interactive process" contemplated by the ADA.[30] The interactive process contemplated by the ADA requires the employer, using a "problem solving approach", to:

> (1) Analyze the particular job involved and determine its purpose and essential functions;
>
> (2) Consult with the individual with a disability to *ascertain* the precise job-related limitations imposed by the individual's disability and *how those limitations could be overcome with a reasonable accommodation*;
>
> (3) In consultation with the individual to be accommodated, *identify potential accommodations and assess the effectiveness each would have* in enabling the individual to perform the essential functions of the position; and
>
> (4) Consider the preference of the individual to be accommodated and *select and implement the accommodation that is most appropriate* for both the employee and the employer.

29 C.F.R. §1630, App. §1630.9 ("Process of Determining the Appropriate Reasonable Accommodation" [emphasis added]).

At no time did the City do (2), (3), or (4). No one involved in the process ever considered what, if any, accommodations could be made to enable Murphey to do any of the many laborer jobs he had performed throughout his career and had identified as ones he could now (*i.e.*, at the time of his termination) perform.

---

[30] Page admitted that she knew at all times in 1998 and 1999 that Murphey wanted to remain employed by the City. (Page Dep. 69-70)

Not only did the ADA require the City to engage in this interactive process, but it required the City to conduct itself throughout the process in good faith. *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999) ("The interactive process includes good-faith communications between the employer and employee."); *Cravens v. Blue Cross and Blue Shield*, 214 F.3d 1011, 1021-22 (8th Cir. 2000) (genuine factual issue existed with respect to whether employer acted in good faith); *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000) ("[A]n employer cannot prevail at the summary judgment stage if there is a genuine dispute as to whether the employer engaged in good faith in the interactive process." [Footnote omitted]).

A lack of good faith on the part of the City, and an embarrassing overeagerness to end Murphey's employment, are more than evident from the record. Mary Page, the City employee most responsible for the Murphey case, clearly did not like working with him, and was being pressured to get him into the Job Bank (where Murphey's employment could be terminated without cause as long as no job were found for him within 120 days).[31] Each affected department and program was worried about having to devote any of its budget to the matter, and each tried to get others to assume financial responsibility. Page eventually arranged the Engineering Aide I position for Murphey, simply to get him into the Job Bank and the 120-day period running. After three months in that position, Murphey was told that was doing extremely well and that his superiors had decided to keep him in that position, leading him to believe, quite reasonably, that the 120-day Job Bank requirement had been met. Several weeks later, and only 114 days into the Job Bank period, the City fired him, abruptly and without warning, ostensibly for not finding a job within 120 days.

[31] The head of the Job Bank (Katherine O'Neill) wanted to terminate Murphey before he even got into the program.

In short, the City actively misled Murphey into believing his employment was not in jeopardy and, in its eagerness to be done with him, jumped the gun and fired him early, violating its own Job Bank policy.

The City was well aware of its mis-steps in this process and was given the opportunity immediately after the discharge to correct them, but chose not to do so. An e-mail from Nancy Ross from February of 2000 makes this clear, where she noted shortly after Murphey's discharge that she didn't believe Murphey had been "given the opportunity to interview at other positions while in the job bank" or "meet with Mary Page or Bob Etzoni on a regular basis while in the job bank". (Ross Dep. 60-61; Dep. Ex. 17)[32] Ross also noted in the same e-mail message (a) that she believed "more attention is needed by the generalist [in this case Mary Page] and the return to work coordinator" in these situations, (b) that she believed Murphey's situation raised serious ADA concerns, and (c) that she was worried that any court reviewing this situation would be concerned about the City's failure to place Murphey in a job within his restrictions instead of terminating him. (Ross Dep. 61-64)[33]

JAMES G. RYAN
Attorney for Plaintiff

Dated: March 25, 2005

*/s/ James G. Ryan*
James G. Ryan
Attorney Reg. No. 155962
820 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 338-3872

---

[32] Generalists like Page had the obligation under the Return to Work/Job Bank Program "to make regular contact with the injured employee and provide any job leads that f[e]ll within the employee's physical limitations". (Ross Dep. 55)

[33] At her deposition, Ross at first denied having had any of these concerns. (Ross Dep. 55-58) After being shown her e-mail, she changed her mind, albeit reluctantly. (*Id.* 59-65)