**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| **Robert K. Murphey, Jr.,** | **Case No.: 01-10 JNE/JGL** |
| **Plaintiff,** | |
| **vs.** | |
| **City of Minneapolis,** | **DEFENDANT'S TRIAL MEMORANDUM** |
| **Defendant.** | |

---

**INTRODUCTION**

Murphey started working for the City in June of 1971 as a Seasonal Laborer. Murphey worked in sanitation for the first season and worked in the Paving Department as a Laborer after the first season. In November 1977, Murphey was injured on the job and was off work for a period of five years to attend the University of Minnesota. In the spring of 1982 or 1983, Plaintiff returned to the City. When he returned to work, he performed some of the duties of an Engineering Aide I during this summer, including soil testing, surveying, taking measurements, and quality control. The following summer, Plaintiff returned to Paving Construction as a Laborer. In 1995, Plaintiff was reinjured by lifting a compressor off the back of a utility truck. Plaintiff was off of work for three to four weeks based on his doctor's recommendation. Plaintiff returned to work after the recommended three to four weeks. Murphey was reinjured in 1996 from lifting heaving metal castings that weighed approximately 200 pounds. He was off of work based on his doctor's recommendation and returned to work after the three to four weeks. In April or May of 1997, Murphey was offered the opportunity to join the Ramps Division based on his seniority and he took advantage of that opportunity. In May 1997, Plaintiff was reinjured when he was lifting and operating a high-pressure washer. Murphey was off of work for three to

four weeks based on the recommendation of his doctor and returned to work in the Ramps Department after those three to four weeks. When Murphey returned to work, he was given light duties as a Painter's Assistant. As a Painter's Assistant, he assisted the painter with taping, paint preparation, cleaning brushes, and driving to and from the assigned areas where the painter would paint. Murphey performed these light duties until October 1997, within the restrictions based on his May 1997 injury. Plaintiff had a lifting restriction of 20 pounds, with bending restrictions, no prolonged sitting, and no prolonged standing.

In October 1997, Murphey had a meeting with Nancy Ross. In this meeting, Plaintiff advised Ross that he wanted to work as a full-time City employee. Ross advised that full-time employment was not possible at that time and placed Murphey on workers' compensation. After the October 1997 meeting, Ross and Murphey had pretty regular communications regarding attempting to find Murphey a suitable position with the City. Ross found a Safety Specialist position for Murphey that he could apply for. Ross also attempted to provide Plaintiff with a job in the Water Department, which did not work out. Murphey then performed light duties in the Financial Department sorting water bills. This job was approved by Plaintiff's doctor and Murphey was also approved by his doctor to work four hours per day. Because the City elevated his desk through placement of a cardboard box, Murphey was able to alternate between sitting and standing when sorting bills to alleviate problems with his back. After Murphey was no longer performing light duties in the Financial Department, he had kept in touch with Nancy Ross about once a week. Plaintiff also called the City Job Hotline to determine vacancies within the City.

In the late summer or early fall of 1998, Plaintiff began working at the Lands and Buildings Department doing janitorial-type duties. Before commencing these light duties,

Plaintiff, Mary Page from Human Resources, the qualified rehabilitation counselor of Plaintiff, and two representatives from Lands and Buildings had a meeting to discuss the light duties. Murphey was willing to attempt to do the job and see how it went. The light duties that Murphey performed were picking up cigarette butts, changing towels in the restrooms, emptying wastebaskets, and tending to plants. Murphey performed these light duties for approximately six to eight weeks.

On approximately October 13, 1998, Plaintiff had a meeting with Mary Page of Human Resources regarding Murphey entering into the Job Bank. Under the Job Bank, Murphey would be placed into the Job Bank, and if he did not receive a full-time job within 120 days, he would be terminated from the City. Murphey refused to continue to perform the light janitorial duties and, because of this refusal, was not placed in the Job Bank.

After the October 13, 1998 meeting, Murphey kept in contact with Mary Page regarding finding full-time work. Murphey inquired about truck driving jobs, some heavy equipment operating jobs, and promotional type jobs such as foreman/supervisor type jobs. If Murphey was interested in specific jobs, Page would check into the jobs and get back to Murphey. After the October 13, 1998 meeting, Plaintiff continued to have discussions with Nancy Ross through his attorney.

In March 1999, Murphey completed a three-week in-patient program at a pain clinic. Murphey had entered into a Stipulation of Settlement related to his workers' compensation clam in which he agreed that he would enter the Job Bank after the completion of the pain clinic treatment.

Murphey was granted a one-week leave of absence on June 28, 1999 because of his daughter's death. On June 7, 1999, an intoxicated man hit his daughter in a motor vehicle

accident. She was placed on life support and was taken off life support two days later on June 9, 1999.

Murphey had an interest in doing Engineering Aide I duties and discussed this interest with Mary Page. On July 6 or July 7, 1999, Murphey had a meeting with Michelle Michurski, Nancy Ross, and Bob Etzioni, of the City to discuss a light duty job and Plaintiff's entering into the Job Bank. During that meeting, the Job Bank was explained to Murphey and Murphey understood that if the City did not find a full-time job for Murphey within 120 days in the Job Bank, he would be terminated.

Murphey started doing Engineering Aide I duties on July 12, 1999. Murphey's duties were basically inside the office, including proof reading aerial maps and making corrections. Murphey was able to do these Engineering Aide I duties within his medical restrictions. When he performed the Engineering Aide I duties, Murphey was not using CAD and manual techniques to prepare layouts. Murphey was not creating any geographic information system products. In addition, Murphey was learning engineering calculations through on-the-job training. The typical Engineering Aide I duties of Plaintiff were topo update duties, which included updating aerial photographs. Murphey did not perform surveying duties, but claims he assisted with surveying a couple of times.

For less than a week, Murphey worked 8-hour days doing Engineer Aide I duties. Plaintiff then had difficulties with full-time work because of the long drive from home and the death of his daughter, who died on June 9, 1999. Murphey was then working four hours a day and was placed on a work hardening program in which he would increase his hourly work output per day. Because of the death of his daughter, Murphey never increased the hours worked per day beyond the four hours.

On October 15, 1999, a meeting was held in which Mary Page, Nancy Ross, Assistant City Attorney Edward Backstrom, and the attorney for Murphey, Tom Mottaz, were present. The purpose of this meeting was to discuss the status of Murphey as it pertained to his job in the Engineering Division. At that meeting, Murphey was told that his supervisors were satisfied with his work in the Engineering Aide I duties. Plaintiff admits that no one at that meeting guaranteed that he would have a job with the City. At that meeting, the individuals present discussed classes that Plaintiff could take that would enhance Plaintiff's skills. Murphey left that meeting believing he had secured a permanent job as an Engineering Aide I for the rest of his career with the City of Minneapolis because he was told he was doing an excellent job and that his supervisors loved him. After the October 15, 1999 meeting, Plaintiff continued to do Engineering Aide I duties on a full-time basis until he was terminated from the Job Bank.

By letter dated November 3, 1999, Murphey was advised that he was terminated from the City because a full-time job was not available. After Murphey's termination from the City, he continued to perform Engineering Aide I duties on permit, a temporary basis. He continued to perform such duties on permit until November 30, 1999, when he quit because of the 2-hour drive to work. On December 23, 1999, a letter was sent to Plaintiff stating that there was work for him in the Engineering Services Division. However, Murphey did not return to his permit work because he was not interested in working as a permit employee.

Murphey was under a retraining program through workers' compensation to obtain a two-year degree as a civil tech, which is the equivalent of an Engineering Aide I. During the first semester of this retraining at South Central Technical College, Murphey got incompletes in his courses. In the first semester, Murphey took a math course. He dropped that math course on the first day of the semester because it was very obvious to him that the instructor was talking about

things with which he knew he would have some difficulty. After the first semester, Murphey took remedial courses in basic computers and math. Murphey never completed the degree.

While he was working with the City, Murphey applied for the Engineering Aide I position twice. Both times, he was rejected because he did not meet the education and experience requirements for the position. The Engineering Aide I is a grade 5 position. The Construction and Maintenance Laborer is a grade 4 position and any position above a grade 4 would be promotional for Plaintiff.

Murphey applied for the Customer Service Rep I position, but stated he would not meet the requirements for this job. Plaintiff applied for the Public Works Safety Specialist position, a grade 8 position, on August 7, 1998. He was ranked 56 out of 64 applicants and was not chosen for an interview because a Rule of 3 was used.

Murphey applied for the Foreman, Ramp Repair and Restoration position, which is a grade 8 position, on January 28, 2000. This position would have been a promotional job for Plaintiff. He was notified that he was ranked 13 on the eligible list. He was not chosen for an interview because the Rule of 3 was used.

In the Complaint, Murphey suggests positions that he could perform within his medical restrictions. Murphey lists the tag person, dump master, and utility driver to be all duties within the Construction and Maintenance Laborer position. Murphey believes the Grade Setter position was a position that became a separate job within Paving, and was no longer part of the Construction and Maintenance Laborer position. However, grad setting is one duty of a Construction and Maintenance Laborer. Murphey also claims he could work as a Painter's Assistant. However, Murphey cannot cite to a vacancy for the Painter's Assistant position.

Murphey has received disability benefits from U.S. Life. He started receiving payments, which were paid directly to his mortgage company, of $534.00 per month in 1999. Pursuant to the policy, the disability definition was "Total disability means that due to sickness or accidental injury you are unable to perform the duties of any occupation for which you are reasonably qualified by education, training or experience." Murphey also received disability benefits through the Public Employees Retirement Association (hereinafter, "PERA") of around $525.00 a month from October 14, 1998 through August of 2001. The definition of disability for PERA purposes is "Inability to engage in any gainful activity by reason of any medically determinable physical or mental impairment which can be expected to be of long-continued and indefinite duration." Murphey has been receiving Veteran's Administration disability benefits for post traumatic stress disorder, which are retroactive to 2001, of over $2,000.00 per month.

Murphey claims that his disability is his lower back degenerative disk disease also known as spinal stenosis. Murphey states that the changes in his daily life that have been affected are as follows: Murphey can no longer mow his own lawn; Murphey can no longer garden; Murphey can no longer raise little animals on his hobby farm; Plaintiff can no longer plow his own driveway; and Murphey can no longer fix up or rebuild the 121 year old farmhouse that he purchased. He claims his alleged disability affects his ability to work because he has to be careful about what he does and how he does it to avoid risking reinjury. Murphey also claims that he is no longer able to go horseback riding, and his ability to perform household activities, such as mopping and vacuuming, is impacted. Plaintiff filed the instant action in December 2000, alleging disability discrimination under the American's With Disabilities Act.

## ISSUES

The issue to be determined at trial is whether Defendant was subject to disability discrimination by Defendant City of Minneapolis. More specific issues include, but are not limited to, whether Plaintiff had a disability, whether plaintiff was a qualified disabled individual and whether Defendant reasonably accommodated Plaintiff.

## ARGUMENT

Defendant has brought only one claim in this instant action, a claim for relief under the Americans With Disabilities Act, 42 U.S.C. § 12101 *et seq.* A disabled person, under the ADA, is any person who has a physical, sensory or mental impairment which substantially limits one or more major life activities. 42 U.S.C. § 12102(2). A "qualified individual with a disability" within the meaning of the ADA is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111 (8).

Plaintiff is not disabled under the ADA. At the time of his termination, Plaintiff had a 20 pound lifting restriction, he had bending restrictions, and he was prohibited from engaging in prolonged sitting and prolonged standing. The evidence will show that he was not substantially limited in a major life activity as compared to an average individual.

Plaintiff is not a qualified disabled individual. The evidence will show that based on a physical impairment, Plaintiff could no longer perform the essential functions of his Construction Maintenance and Laborer position.

The evidence will show that while Plaintiff was employed with the City, the City allowed Plaintiff to work within medical restrictions when Plaintiff had periodic work injuries. When Plaintiff could not longer perform the essential functions of the Construction and Maintenance

Laborer position, he was placed in the Job Bank for 114 days. While he was in the Job Bank, the City looked for alternative positions for which Plaintiff could meet the minimum qualifications and could perform the job with or without reasonable accommodations. Unfortunately, there were no non-promotional positions into which Plaintiff could be placed. Plaintiff also competed for some promotional positions with the City, but was not chosen for such positions.

While Plaintiff claims that he was performing the Engineering Aide I position while he was in the Job Bank, the evidence will show that Plaintiff only performed some of the duties of that position and that he did not meet the minimum qualifications for that position, and was therefore not a qualified individual with respect to the Engineering Aide I position. The evidence will show that Plaintiff had been taking courses through workers' compensation that would train him to become an Engineering Aide I, but that Plaintiff did not have the mental capacity to understand the coursework. The evidence will also show that Plaintiff competed for the Engineering Aide I position and was rejected twice because he did not meet the minimum requirements of the position.

**CONCLUSION**

Defendant submits that the evidence at trial will not support Plaintiff's claim of discrimination under the American's With Disabilities Act.

Dated: March 25, 2005

JAY M. HEFFERN
City Attorney
By

s/Caroline M. Bachun
CAROLINE M. BACHUN
Assistant City Attorney
Attorney Reg. No.024370X
Attorneys for Defendant
333 South Seventh Street, Suite 300
Minneapolis, MN 55402-2453
(612) 673-2754